UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

| | |
|---|---|
| Philip Sieff, as Trustee for the next-of-kin of Dawn Marie Pfister, Deceased, | Case No. _____ |
| Plaintiff, | |
| v. | **COMPLAINT** |
| Brady Juell, acting in his individual capacity as a Chaska Police Officer and the City of Chaska, | **Jury Trial Demanded Under FRCP 38(b)** |
| Defendants. | |

---

For his Complaint, Philip Sieff, as Trustee for the next-of-kin of Dawn Marie Pfister, states and alleges as follows:

1. Philip Sieff ("Plaintiff") was appointed as Trustee for the next-of-kin of Dawn Marie Pfister ("Pfister") on May 20, 2014 by Hennepin County District Court Judge Marilyn Brown Rosenbaum, and, therefore, is a proper person to assert a federal cause of action for the violation of the civil rights of Dawn Marie Pfister.

2. This is an action for money damages arising out of the unconstitutional use of deadly force by defendant Brady Juell ("Juell") on February 7, 2014 on Highway 212 in Eden Prairie, Minnesota.

3. Juell violated Pfister's well-settled federal civil rights while acting under color of state law.

4. Plaintiff also asserts claims against the City of Chaska (sometimes referred to herein as the "City") under *Canton v. Harris*, 489 U.S. 378 (1989).

5. Pfister was, at all times material herein, a citizen of the United States and a resident of the State of Wisconsin.

6. Pfister was the 34-year-old mother of two minor children, B.P. and L.P., who were 12 and 9 years-old, respectively, at the time of Pfister's death.

7. Upon information and belief, Defendant Juell was, at all times material herein, a citizen of the United States and a resident of the State of Minnesota. Juell is sued in his individual capacity as a Sergeant of the Chaska Police Department.

8. Because the Minnesota Bureau of Criminal Apprehension's ("BCA") improperly refuses to provide plaintiff or his counsel a complete set of the best evidence, the unredacted squad videos, which show the position of Dawn Marie Pfister on the ground as Juell and another officer approach her, the position of Juell and the other officers at the time Dawn Marie Pfister is shot and the non-existent level of threat she posed at that time, along with the level of threat that Matthew Serbus ("Serbus") posed when Juell delivered his "finishing shot" to Serbus' head and face, it is uncertain whether another officer other than defendant Juell shot Pfister as she lay on the ground on February 7, 2014. For this reason, Plaintiff reserves the right to amend the pleadings and add parties if the need arises after production of the critical evidence.

9. Defendant City of Chaska is a municipality duly incorporated under the laws of the State of Minnesota.

10. Plaintiff brings this action pursuant to 42 U.S.C. §§ 1983 and 1988, the Fourth Amendment to the United States Constitution and 28 U.S.C. §§ 1331 and 1343(a)(3). The

2

aforementioned statutory and constitution provisions confer original jurisdiction on this Court over this matter.

11. In this lawsuit, Plaintiff seeks compensatory and punitive damages for violation of Pfister's civil rights a result of the use of unreasonable deadly force that killed her on February 7, 2014.

12. As she was seated or laying on the ground, Pfister was shot four times (3 in the chest and 1 in the back) all while she posed no immediate threat of serious bodily harm or death to police officers or others. She died as a result.

13. Defendant Juell received a dispatch call for an erratic, speeding driver headed eastbound on Highway 212 towards Chaska.

14. Dispatch then reported that the Serbus vehicle hit another vehicle and was continuing eastbound on Highway 212.

15. Pfister was the sole passenger in a red four-door 2002 Saab driven by Serbus during the course of the police chase. Upon information and belief, Serbus stole the vehicle from Denver, CO. Pfister did not exercise any control over the movement, speed or direction of the Saab.

16. Defendant Juell observed the Serbus vehicle driving eastbound on Highway 212 with the hood on the vehicle straight up, blocking the windshield.

17. Defendant Juell pursued the Serbus vehicle with lights and siren activated, but Serbus did not pull over. Defendant Juell said that the pursuit "totally sent my nerves though the roof" . . . "put me on high alert" and Juell took out his rifle, charged it and put it

on his lap. Juell carried the Smith & Wesson M & P 15 .223 caliber rifle in a rack in his patrol vehicle.

18.   Juell heard Minnesota State Trooper Mark Lund come on the radio and decided to properly relinquish control of the pursuit to him, as the more trained and experienced chase driver.

19.   Trooper Lund stated that, at the time defendant Juell relinquished pursuit, Trooper Lund "still had no clue what they were chasing 'em for."

20.   Trooper Lund contemplated using a Precision Immobilization Technique ("PIT") maneuver, but the Serbus vehicle lost control and crashed into the right barrier wall on eastbound Highway 212 near Highway 101 at Dell Road.

21.   After crashing into the barrier wall, the Serbus vehicle's momentum stopped and the vehicle did not move again through the time of the fatal shootings.

22.   Upon information and belief, eleven law enforcement officers responded to the scene. The police agencies represented were the Chaska Police Department, Minnesota State Patrol and Carver County Sheriff's Office.

23.   Of the eleven officers, four admitted to the BCA that they fired their weapons at the scene: Trooper Lund of the Minnesota State Patrol; Deputy Nathan Mueller of the Carver County Sheriff's Department; Officer Trenton Wurtz of the Chaska Police Department; and Sgt. Brady Juell of the Chaska Police Department.

24.   After the pursuit ended with the Serbus vehicle colliding into the barrier wall, law enforcement officers, including defendant Juell, exited their vehicles preparing for a high-risk felony stop.

25. Defendant Juell stated: "I try to get out of the car. I am so jacked up, my adrenaline's goin' because I'm so scared that here it goes, here it goes, he's gonna start shootin'. He's gonna get out and start shootin'. It just, the way they were movin', the way they were acting, that's what's goin' through my head. I choked myself on the seatbelt because I forgot to un-belt my seatbelt."

26. Trooper Lund, in MSP 40081, was the closest squad car and officer to the Serbus vehicle. Lund was in command as the primary officer in the chase. He gave clear voice commands to Serbus and any other occupants of the car, as well as advising the other officers on the scene of the things he could observe from his vantage point; the closest and most directly facing the Serbus vehicle interior.

27. His comments are documented completely on his unredacted squad video.

28. The other officers appear to defer to Trooper Lund.

29. Serbus dragged Pfister from the driver's door of the Saab. Serbus held onto Pfister, appearing to treat her as a human shield or as Trooper Lund puts it "body armor" between him and the police officers. Trooper Lund stated: "He's going for a gun. Got her as body armor."

30. All responding officers viewed Pfister as Serbus's hostage. Trooper Lund unequivocally and forcefully declared that this was a "hostage situation" and identified the lone female as the hostage. The video evidence corroborates this. Chaska Police Officer Lee Meyer stated that he saw Serbus and Pfister exit the vehicle and he thought Serbus was going to try to kill Pfister. There is no evidence contrary to these assertions.

31. Ultimately, Lund identifies the weapon in Serbus' hand as a knife.

32. Serbus did not have a gun and Pfister did not have any weapon.

33. Upon information and belief, Trooper Lund fired the first shot at Serbus using his Glock .40 caliber pistol to protect Pfister from Serbus.

34. Trooper Lund gave continued verbal commands to Serbus and his hostage to get on the ground. The Trooper's squad video verified that even with Serbus menacing her with a knife, Pfister complied with the command by voluntarily going down to the ground only to be quickly pulled back up by Serbus. Upon information and belief, Pfister's compliant act was apparent to all officers on the scene and certainly to the four officers who ultimately fired their weapons to protect Pfister from Serbus and his knife.

35. Serbus never did respond to or obey verbal commands by law enforcement.

36. Trooper Lund stated that Serbus appeared to have one hand behind his waistband. Trooper Lund stated that Pfister appeared to be the "innocent victim" and that he gave multiple commands and warnings to Serbus without any response.

37. With regard to what is believed to be the first shot fired by anyone at the scene, Trooper Lund stated:

> [S]o as he's dragging her backwards, his body becomes more visible and I'm trying and he's still got the hand behind his back, he's still posturing that he's gonna fire and he's got her with him, whether it be as a victim or other obviously becomes more apparent later but at one point he pops up as to fire and at that same time I fired. And then he staggered back so I know that I took the first shot and I'm 99% positive I him 'em 'cuz her (sic) staggered a little bit back.

38. According to Trooper Lund's statement, Serbus then showed a knife and appeared to be stabbing Pfister. Defendant Juell determined that Serbus had a knife before firing his rifle at Serbus. Juell also stated that he thought Serbus was stabbing Pfister.

6

Trooper Lund, Sgt. Juell, Officer Wurtz and Deputy Mueller all discharged their weapons multiple times at Serbus to protect Pfister from the imminent danger Serbus posed to her. All these shots were fired as Serbus dragged Pfister away from, not nearer to, the officers. Upon information and belief, none of these shots struck Pfister.

39. Serbus went down to the ground and dragged Pfister down with him.

40. Lance Pearce is a Sergeant with the Carver County Sheriff's Office. Upon information and belief, he was carrying a handgun and a body bunker, which is a large shield.

41. Upon information and belief, Sgt. Pearce and defendant Juell advanced on Serbus and Pfister as the two of them were laying on the ground after Serbus had already been shot many times. Upon information and belief, Pfister was uninjured when she was dragged to the ground by Serbus.

42. At no point during the encounter with law enforcement and Serbus did Pfister pose an immediate threat of serious bodily harm to officers or others.

43. In his statement to the BCA, Sgt. Pearce explained why he did not shoot:

> I did not shoot for a couple of reasons. Um I obviously (inaudible) I believe we had a (inaudible) ["hostage" upon information and belief]. I didn't shoot because where my handgun was and where Trooper Lund was kneeling down, I had six or eight inches distance between his head and my firearm . . . I wasn't going to take that chance.

44. Sgt. Pearce gave a statement to the BCA on February 7, 2014—the date of the incident. At no point in his statement did Sgt. Pearce express that he contemplated firing his handgun with Pfister as the intended target.

45. Defendant Juell who, upon information and belief, was advancing with Sgt. Pearce on Serbus and Pfister after Serbus was shot, admitted to the BCA that he shot with Pfister as his intended target.

46. He did so without giving her any warning that he would shoot or orders about what he wanted her to do to avoid being shot.

47. Pfister did not say anything to the officers, including Officer Juell, let alone threaten the officers.

48. Pfister never expressed any verbal or other intention to harm anyone at the scene, let alone a threat to stab or kill the officers.

49. Defendant Juell stated that he fired an unknown number of rounds at Pfister. The Hennepin County Medical Examiner's autopsy seems to indicate that that number is three. He then stated that he fired at Serbus again as he lay on the ground already in his words "riddled with bullets." He stated that "I think I hit him in the head again, the face."

50. All four of the officers who admitted to firing their weapons shot 21 bullets at Serbus as their intended target because of the imminent threat of death or serious bodily harm he posed to Dawn Marie Pfister, the person that all officers perceived as a hostage, with the only weapon he possessed - a knife.

51. Juell stated: "I knew I was the only one with the rifle ... who had the firepower to stop this guy at this point. I'm very good with that .223, I put it center mass and fired 'em ... [I]n order to protect her and keep him from stabbing her I kept firing."

52. Upon information and belief (because of the BCA's failure to turn over the squad videos), only defendant Juell admittedly fired his weapon at with Dawn Marie Pfister

8

as the intended target. Juell stated "... I was looking through my sight I hit her right in the chest ... two, three times." At that moment, no reasonable officer would believe that Pfister posed a threat to Juell or anyone else. Nor did any other officer fire at Pfister with the belief that she was a threat.

53. At the moment Juell fired his rifle at Serbus the final time, Serbus was neither a threat to Pfister, Juell or any officer.

54. After finishing Serbus, according to his BCA statement, defendant Juell fired at Pfister again as he retreated away from Serbus and Pfister for this stated reason: "[C]uz I know what she's gonna do, she's gonna come up and stab us with that knife." At the time of Juell's last shot, Pfister was laying on the ground; already shot three times by Juell's .223 rifle shot.

55. Fifteen of the twenty-six cartridge casings recovered by the BCA at the scene came from defendant Juell's M&P 15 .223 caliber rifle.

56. Deputy Mueller and Trooper Lund fired .40 caliber pistols while Officer Wurtz fired a .357 caliber pistol.

57. Indeed, it is reasonable for any hostage held at knifepoint, in such a violent manner that four officers made the decision to shoot the knife-wielder, to take possession of the knife previously used to threaten her if at all possible.

58. BCA personnel responded to the scene along with Dr. Andrew Baker and Investigator Chaia Herrgott from the Hennepin County Medical Examiner. BCA Special Agent-in-charge Scott Mueller consciously made the following, provably false, report to Herrgott and/or Dr. Baker ostensibly for the purpose of influencing the investigation, then

in its infancy, to: improperly exonerate Brady Juell; hinder the search for the truth and the proper administration of criminal justice; and to frustrate the assertion of the civil rights of Dawn Marie Pfister:

> The officers quickly responded by shooting the male with the "shots fired" call airing at 0754. The male fell to the ground with the knife. *[Pfister] ran over to [Serbus], grabbed the knife from him and then began advancing towards law enforcement with it. She was promptly shot upon her approach.*

(emphasis added). SA Mueller's complete fabrication about Pfister's conduct that supposedly would justify shooting her appears in the Main Narrative of the Hennepin County Medical Examiner's report. This will be completely debunked and exposed for what it is once the unredacted squad videos are released.

59. In addition, other BCA agents under Mueller, Special Agent Michael Phill, Special Agent Luke Hanegraaf and Special Agent Gary Swanson all tried to improperly suggest and improperly elicit false police statements about the actions of Dawn Marie Pfister and her unspoken and unknowable motivations. These tactics are exposed by the unredacted squad videos when compared to transcripts and tapes of interviews done by these agents of the police officers who were on the scene. These actions were done to improperly exonerate Brady Juell, to hinder the search for the truth and the proper administration of criminal justice, and to frustrate the assertion of the civil rights of Dawn Marie Pfister.

60. Defendant Juell's use of deadly force on Pfister was objectively unreasonable under well-established Fourth Amendment precedent, including *Tennessee v. Garner*, 471 U.S. 1 (1985).

61. If the evidence withheld by the BCA reveals that any other officers on the scene used deadly force on Pfister then that officer's use of deadly force was objectively unreasonable under well-established Fourth Amendment precedent, including *Tennessee v. Garner*, 471 U.S. 1 (1985).

62. Pfister suffered a loss of economic opportunity.

63. Pfister suffered pain and suffering from the time she was first shot until the time of her death.

64. Pfister suffered the loss of the enjoyment of her life.

65. Plaintiff is entitled to recover these damages for Pfister's next-of-kin.

### COUNT ONE—FOURTH AMENDMENT VIOLATIONS AGAINST JUELL

66. Plaintiff realleges the foregoing Paragraphs as if fully set forth herein.

67. By the actions described above, Juell, under color of state law, violated and deprived Pfister of her clearly established and well-settled civil rights to be free from unreasonable searches and seizures and the use of excessive and unreasonable deadly force in violation of the Fourth Amendment.

68. Pfister died as a direct and proximate result of Juell's unconstitutional conduct and her next-of-kin were thereby damaged in an amount as yet to be determined.

69. Juell subjected Pfister to these deprivations of her rights in such a manner so as to render Juell liable for punitive damages.

70. Punitive damages are available against defendant Juell and are hereby claimed as a matter of federal common law under *Smith v. Wade*, 461 U.S. 30 (1983), and as such, are

not subject to the pleading requirements or the differing standard of proof set forth in Minn. Stat. Ann. § 549.20.

71.     Plaintiff is entitled to recovery of costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

## COUNT TWO—*CANTON v. HARRIS*
## AGAINST THE CITY OF CHASKA

72.     Plaintiff realleges the foregoing Paragraphs as if fully set forth herein.

73.     Before February 7, 2014, the City of Chaska with deliberate indifference to the rights of citizens failed to properly train its officers or failed to require adherence to appropriate policies to avoid the improper use of deadly force on citizens posing no immediate threat to anyone.

74.     Upon information and belief, the City of Chaska ratified and approved defendant Juell's misconduct (captured on video for City policymakers to see), and failed to discipline Juell; instead returning him to his normal law enforcement activities. Consequently, there has been an approval of a deficient policy, custom or practice and inadequate training of the improper use of deadly force.

75.     Pfister's death and the violation of her rights were directly and proximately caused by the aforementioned acts and omissions and by the City's failure to train, and the City of Chaska is thereby liable for compensatory damages in an amount as yet to be determined.

76.     Plaintiff is entitled to recovery of costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

WHEREFORE, Plaintiff Philip Sieff as Trustee for the next-of-kin of Dawn Marie Pfister prays for judgment against defendants as follows:

1. As to Count I, a money judgment against Defendant Juell for compensatory damages in an amount to be determined and punitive damages in an amount in excess of Five Million ($5,000,000) Dollars together with costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988 and prejudgment interest;

2. As to Count II, a money judgment against the City of Chaska for compensatory damages in an amount to be determined together with costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988 and prejudgment interest;

3. For an Order requiring the imposition of appropriate discipline against Juell;

4. For an Order compelling the immediate production of the best evidence in the case—namely, the complete unredacted squad videos without any further delay for discovery;

5. For an Order mandating changes in the policies and procedures of the City of Chaska Police Department requiring, among other things, proper training in the constitutional limitations on the use of deadly force by police officers; and

6. For such other and further relief as this Court deems just and equitable.

Date: 2/2/15

GASKINS BENNETT BIRRELL SCHUPP L.L.P.

*Robert Bennett*

Robert Bennett, #6713
Andrew J. Noel, #322118
Kathryn H. Bennett, #392087
333 South Seventh Street, #3000
Minneapolis, MN 55402
Telephone: 612-333-9500
rbennett@gaskinsbennett.com
anoel@gaskinsbennett.com
kbennett@gaskinsbennett.com
Attorneys for Plaintiff