UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Philip Sieff, as Trustee for the next-of-kin
of Dawn Marie Pfister, Deceased,

Case No. 15-cv-00419 (PAM/LIB)

Plaintiff,

v.

Brady Juell, acting in his individual
capacity as a Chaska Police Officer,

Defendant.

**MEMORANDUM IN
OPPOSITION TO
DEFENDANT JUELL'S
MOTION FOR SUMMARY
JUDGMENT (REDACTED)**

---

## INTRODUCTION

Defendant Brady Juell ("Juell") moves for summary judgment for his shooting of a

hostage, Dawn Marie Pfister ("Pfister"), on February 7, 2014.[1]  Juell asserts he is entitled to

qualified immunity for his imaginary and unreasonable belief that Pfister posed an immediate

threat of serious physical harm to himself and others.  He proffers assumptions, mind

reading, predictions, misperceptions and post-incident exaggerations (*or lies*) to justify

shooting Pfister four times with his rifle.  Juell also relies heavily on the statements the

eleven involved officers provided to Bureau of Criminal Apprehension ("BCA") during its

investigation of the incident.  These statements were not provided under oath and, according

to Juell's own expert, were lacking,[2] contained leading questions[3] and were not conducted in

---

[1] *See* ECF Doc. No. 54 (Stipulation to Dismiss Chaska and Failure to Train Claim) and ECF
Doc. No. 55 (Order on the same.)

[2] Exhibit 1 to the Affidavit of Robert Bennett, Deposition of Stephen Ijames ("Ijames
Dep.") at 13:1-2.  All exhibits are attached to Bennett's Affidavit.

[3] *Id.* at 14:20-15:10.

the same manner as a shooting involving civilians would have been.[4]  Importantly, Juell's BCA statement did not occur until five days after he killed Pfister and after he had ample time to consult his criminal defense attorney.  Further, when the other officers were confronted with the videos of the incident at their depositions, the majority recanted the version provided to the BCA.

The evidence, including two videos of the incident, shows that Juell shot Pfister four times while she was partially on the ground and, contrary to Juell's claim, had not lessened her proximity to, advanced on or attacked any officer with the folding knife with a 3 ¼ inch blade.  One of Juell's bullets entered Pfister's upper left back and exited her anterior right axilla.[5]  She died at the scene.

Under the totality of the circumstances, Juell's decision to shoot Pfister was not objectively reasonable.  By their actions, the ten other officers at the scene, including the officer **closest** to Pfister at the time she was shot, agreed –none of them fired a single shot at her.  All of the other officers who did fire that day fired only to **protect** Pfister from Matthew Serbus (the driver of the pursued vehicle and individual who held Pfister hostage).

In support of Juell's arguments, he cites **one** case that purportedly stands for the proposition that he is entitled to qualified immunity – *Morgan v. Cook*.  However, Juell ignores the cases that are particularized and most relevant to the Court's determination of qualified immunity in this matter – those involving a small weapon where the individual did not advance, threaten or attack any officer (where they did not pose a threat of serious physical harm.)  *See White v. Pauly*, 580 U.S. --, 2017 WL 69170 at *5-6 (S. Ct. Jan. 9, 2017)

---

[4] *Id.* at 14:1-19; 16:11-17; 24:23-25.
[5] Ex. 2, Pfister Autopsy.

(requiring particularized cases.)  In the following cases, which are factually aligned with the undisputed videos, forensic and other evidence, and with the no-shoot conduct of the 10 other officers at the scene of this February 7, 2014 incident, many courts determined the shooting officers were **not** entitled to qualified immunity:

- In *Tenorio v. Pitzer*, 802 F.3d 1160, 1160 (10th Cir. 2015), cert. denied, 136 S. Ct. 1657 (2016), the court held: "summary judgment on qualified immunity grounds was not warranted" and "it was clearly established that it was unreasonable for officer to use deadly force against suspect with knife who was not making hostile motions."  This case involved a 2011 incident where an officer shot Tenorio who held a small kitchen knife loosely, was not within striking distance of the officer, had merely taken three steps toward the officer, did not speak, had a blank stare on his face, and made no aggressive move toward any officer.  *Id.* at 1166.

- In *Capps v. Olson*, 780 F.3d 879, 885 (8th Cir. 2015), the court denied summary judgment regarding a 2010 incident because there were disputed material facts regarding the reasonableness of the use of deadly force, including whether Capps was moving towards the officer when he was shot.

- In *Samples v. City of Atlanta*, 846 F.2d 1328 (11th Cir. 1988) the court held genuine issues of material fact precluded summary judgment for the excessive force claim. The court cited a number of concerns, including: 1) that the shooting victim's knife was unopened; 2) the knife was small with only a three inch blade; 3) the size difference between the officer and the victim that raised an inference that the situation was not life-threatening; and 4) that one of the officer's bullets hit the victim in the back, which led to the denial of summary judgment.  *Id.* at 1332.

- In *Zulock v. Shures*, 441 Fed. Appx. 294, 294 (6th Cir. 2010) the court held the "officer was not entitled to qualified immunity from excessive force claim."  In this case, the officer shot Zulock while he was: "(1) standing in his own kitchen, holding a cooking knife; (2) had taken no threatening actions other than saying 'fuck you' four or five times; (3) had put down the knife in response to commands, but then hard turned toward Shures, picked up the knife, turned toward the back of the house, made a 'smart remark,' and taken one-half step or one step away from Shures."  *Id.* at 302.

- In *Bui v. City of San Francisco*, 61 F. Supp. 3d 877, 877 (N.D. Cal. 2014) the court held "fact issues precluded summary judgment on excessive force claim" and that qualified immunity did not apply.  Here, "while Bui did have [an] X-Acto knife in his hand, it was always down at his side, and rather than charging at the officers, he assumed a defensive, cringing posture and shuffled slowly down the hall."  *Id.* at 984.  Plaintiffs "also present[ed] evidence that suggest[ed] Bui was not directly facing the officers in

3

the erect position and was turned away to his right from [one officer] when he was shot." *Id.*

- In *Glenn v. Washington County,* 673 F.3d 864, 874 (9th Cir. 2011) the court reversed the district court's granting of summary judgment due to material questions regarding whether the officer's use of less-lethal and lethal force was reasonable. The court explained: "Even though Lukus remained in possession of the pocketknife, a jury could conclude that at the moment officer shot him with the beanbag gun there was little evidence that he posed an 'immediate threat.'" *Id.* Further, there were "material questions of fact about Lukus' and the officers' actions that preclude a conclusion that the officers' rapid resort to deadly force was reasonable." *Id.* at 879.

- In *Zuchel v. Spinharney*, 890 F.2d 273, 273 (10th Cir. 1993), the court "held that there were issues of fact, precluding summary judgment on ground of qualified immunity." Here, testimony "cast[] doubt on the objective reasonableness of Spinharney's use of deadly force[,]" including: Zuchel's estimated distance of 10-12 feet from Spinharney when he was shot, testimony that Zuchel was not charging or stabbing at Spinharney, testimony that Zuchel "was clearly not close enough to stab Spinharney" and testimony that his partner did not see any weapon. *Id.* at 275.

- In *Walker v. City of Orem*, 451 F.3d 1139, 1160 (10th Cir. 2006) (citing *Zuchel*, 997 F.2d at 735-36) the court explained "[i]t was specifically established that where an officer had reason to believe that a suspect was only holding a knife, not a gun, and the suspect was not charging the officer and had made no slicing or stabbing motions toward him, that it was unreasonable for the officer to use deadly force against the suspect." Because plaintiff's version of the facts showed that the individual who was shot had a small knife, did not pose an immediate threat, had made no threats and was not advancing, it showed "the violation of a clearly-established constitutional right" and the court affirmed the denial of qualified immunity.

- In *Maras v. City of Brainerd*, 502 N.W.2d 69, 69 (Minn. App. 1993) the court held in part: "police officer was not entitled to qualified or official immunity." Here, the suspect never raised the knife above his waist, was intoxicated and could barely stand so that even if he did move towards officers, they were not sufficiently threatened. *Id.* at 77.

- In *Herrera v. Las Vegas Metropolitan Police Dept.*, 298 F. Supp. 2d 1043, 1050 (D. Nev. 2004), the "[d]ecedent was not moving toward the officers when he was initially shot with the bean bag rounds; was doubled-over with pain at the time the pepper spray was used; and was merely standing with the knife pointed skyward, stunned for nearly a full minute before he was shot and killed." The court held fact issues existed as to whether some officers used excessive force and those officers were not entitled to qualified immunity. *Id.* at 1043.

4

Juell avoids these analogous cases, which notably do not involve the added fact that all four officers who shot and most of the other officers at the scene believed Pfister to be a hostage. He urges an incomplete analysis by the Court by citing a single, factually distinguishable, less-particularized case. Yet, the unreasonableness of Juell's actions are apparent upon analysis of both the undisputed and disputed facts and the video evidence when viewed under the totality of the circumstances and in the light most favorable to Plaintiff.

## FACTS

### I.      General Overview of the February 7, 2014 Incident

The February 7, 2014 shooting of Pfister and Serbus involved eleven officers from three different agencies, including the Chaska Police Department, the Minnesota State Patrol and the Carver County Sheriff's Office.[6]  The incident was captured by two squad cameras – Minnesota State Trooper Mark Lund's squad camera and Carver County Sheriff's Office Deputy Nathan Mueller's squad camera.[7]

On the date of the incident, Pfister was a passenger in a red Saab driven by Serbus. Numerous driving complaints were made regarding the Saab.[8]  There were reports the vehicle was involved in a crash[9] that caused its hood to fly up and block the windshield.[10] Juell was the first to respond to the call[11] and initially called out wrong directions.[12]  Serbus

---

[6] Ex. 3, BCA Timeline.
[7] Ex. 4, MSP Video; Ex. 5, CC Video.  The MSP video has sound and begins at 00:00.  The CC Video only captured static noise and shows the actual time of day.
[8] Ex. 6, February 7, 2014 all 911 calls.
[9] *Id.*; Ex. 7, Juell Statement at 6.
[10] Ex. 9, Juell Dep. at 34:18-35:3; Ex. 8, Pursuit Radio Traffic at 2:17-2:40.
[11] *Id.* at 1:46.

led the numerous responding officers on a chase[13] through Chaska to Eden Prairie.  Shortly after Lund joined the pursuit Juell relinquished the lead to him,[14] who, unlike Juell, was driving a pursuit rated vehicle.[15]  During the chase, stop sticks were successfully deployed by Sergeant Lance Pearce of the Carver County Sheriff's Office, causing the Serbus vehicle to ride with two flat tires.[16]  While Lund was attempting to execute a PIT maneuver, the Saab crashed on its own without any contact by him.[17]  The Saab crashed into the sound wall and came to a stop on eastbound Highway 212.[18]  Both crashes – the one witnessed by the pursuing officers and the initial crash that caused the hood to fly up – were significant enough to cause injury to restrained or unrestrained passengers.[19]  Juell's expert, Stephen B. Ijames, agrees.[20]

Ten squads arrived at the scene of the crash and parked behind the Saab on Highway 212.  Below is a still photograph from overhead helicopter footage of the scene depicting the array of vehicles:[21]

---

[12] *Id.* at 2:42.
[13] *Id.*
[14] *Id.* at 10:44; Ex. 7, Juell Statement at 10.; Ex. 10, Pearce Statement at 4.
[15] Ex. 9, Juell Dep. at 60:1-10; 64:19-23; Ex. 7, Juell Statement at 4.
[16] Ex. 12, Pearce Dep. at 36:9-15; Ex. 8, Pursuit Radio Traffic at 10:03; Ex. 10, Pearce Statement at 3.
[17] Ex. 7, Juell Statement at 11; Ex. 5, CC Video at 7:48:57-7:49:07.
[18] *Id.* at 7:49:10 (Saab crashed); 7:49:14 (Saab stopped).
[19] Ex. 11, Lund Dep. at 68:16-69:4; 126:9-12.
[20] Ex. 1, Ijames Dep. at 9: 25-10:3; Ex. 2, Pfister Autopsy at 3.
[21] Ex. 13, BCA Diagram; Ex. 14, Godinez Dep. at 19:15-16; Ex. 15, Bramwell Dep. at 18:7-9; Ex. 16, Bengston Dep. at 22:13-16;. Ex. 17, Hamilton Dep. at 78:11-14;. Ex. 18, Fogarty Dep. at 18:13-17; Ex. 19, Meyer Dep. at 35:22-24;. Ex. 20, N. Mueller Dep. at 30:3;. Ex. 12, Pearce Dep. at 58:13-16;. Ex. 21, Wurtz Dep. at 27:17-18; Ex. 9, Juell Dep. at 78:2-4; and Ex. 13, BCA Diagram.



The vehicles contained eleven officers, as one Carver County Sheriff Deputy (James Fogarty) had a probationer or "probie" with him (Andrew Hamilton) on the date of the incident.[22] The eleven officers exited their squads and tactically positioned themselves in a semi-circular array around the Saab.[23]  The tactically arrayed officers had four rifles and seven handguns pointed at the vehicle.[24]

 Serbus was the first to exit the Saab.[25]  He later pulled Pfister out through the driver's side door.[26]  At this time Pfister was identified as a hostage, which can be heard on the MSP

---

[22] Ex. 18, Fogarty Dep. at 18:13-17;  As Hamilton describes, "probie" meant that he was still completing his Field Training on the date of the incident.  Ex. 17, Hamilton Dep. at 8:17-9:9.
[23] Ex. 10, Pearce Statement at 4;  Ex. 12, Pearce Dep. at 86:4-8
[24] Ex. 18, Fogarty Dep. at 58:13-59:14; Ex. 4, MSP Video; Ex. 5, CC Video; Ex. 22, Examination of Physical Evidence.
[25] Ex. 4, MSP Video at 8:25; Ex. 5, CC Video at 7:49:24.
[26] *Id.* at 7:51:04;  Ex. 4, MSP Video at 10:00.

squad video.[27]  Numerous officers agreed Pfister was a hostage[28] and remained so throughout the incident as Serbus used her as body armor[29] and menaced her with a knife.[30] All eleven officers voted with their trigger finger – four by firing their weapons and the rest by not firing.  The four that fired were Lund,  Nathan Mueller and Chaska Police officers Trenton Wurtz and Defendant Juell.  These four shot at Serbus to protect Pfister from him.[31]  But, Pfister – the hostage – was shot and killed by Defendant Juell a second or two after she wrenched the knife from Serbus and absent the proximity, menacing, and stabbing motions that caused the shooting of Serbus.[32]  Juell is the only officer who shot at Pfister.[33]

The BCA investigated this shooting and began taking statements of the involved officers the day of the incident.  Eventually, a grand jury was convened to determine if any of the shooters would be charged criminally for their actions.  A no bill was returned on December 19, 2014.[34]

---

[27] *Id.* at 10:25 ("body armor"); 10:33 ("looks to be a hostage situation"); 10:36 ("hostage situation").

[28] Ex. 12, Pearce Dep. at 5:11-21; Ex. 18, Fogarty Dep. at 61:8-13; Ex. 15, Bramwell Dep. at 32:15-22; Ex. 21, Wurtz Dept. at 20:2-12; Ex. 16, Bengston Dep. at 59:21-60:4; Ex. 19, Meyer Dep. at 50:22-25.

[29] Ex. 11, Lund Dep. at 70:9-23; Ex. 17, Hamilton at 43:6-9; Ex. 21, Wurtz Dep. at 20:2-13.

[30] Ex. 17, Hamilton Dep. at 61:23-25; Ex. 18, Forgarty Dep. at 98:11-13; Ex. 21, Wurtz Dep. at 23:21-23;. Ex. 11, Lund Dep. at 75:18-23;. Ex. 4,  MSP Video; and Ex. 5, CC Video.

[31] Ex. 20 N. Mueller Dep. at 50:3-8; 21, Wurtz Dep. at 23:21-23; 51:11-17;. Ex. 11, Lund Dep. at 41:15-43:23; 55:4-56:9; 75:18-23; Ex. 9, Juell Dep. at 124:17-21.

[32] Ex. 5, CC Video at 7:53:25; Ex. 4, MSP Video at 12:20-12:24.

[33] Ex. 22, Examination of Physical Evidence; Ex. 1, Ijames Dep. at 57:24-58:10.

[34] Ex. 23, Grand Jury No Bill.

## II.    Analysis of the Video Footage

After the Saab crashed and came to a stop along the right side of eastbound Highway 212,[35] officers immediately began giving commands.  It is undisputed that Lund quickly took over the scene as the main officer giving commands.[36]

Approximately 10 seconds after the Saab came to a stop, Serbus exited the vehicle from the driver's side door.[37]  Pfister remained in the vehicle.[38]  For the next minute and a half, Serbus reached back into the Saab through the open driver's door and got in and out of the vehicle.[39]  Serbus then reemerged from the driver's side door with Pfister,[40] keeping her in a position where she was between him and the tactical array of eleven armed officers he was facing.[41]  Approximately 25 seconds later, Lund yelled Serbus was going for a gun and that he had Pfister as body armor.[42]  Lund repeated "her as body armor" seconds later.[43]  Shortly thereafter, officer Wurtz radioed: "it looks to be a hostage situation."[44]  "Hostage situation" was repeated over the radio two seconds later.[45]

Serbus successfully maintained Pfister's body in front of his own as he moved within the right shoulder of eastbound Highway 212.[46]  At 11:16 on the MSP video, Serbus punched his hand out and Lund simultaneously fired the first shot at Serbus because he

---

[35] Ex. 5, CC Video at 7:49:10 and 7:49:14.

[36] Ex. 11, Lund Dep. at 40:15-22; Ex. 7, Juell Statement at 11.

[37] Ex. 4, MSP Video at 8:25; Ex. 5, CC Video at 7:49:24.

[38] *Id.*

[39] Ex. 4, MSP Video at 8:25-10:00; Ex. 5, CC Video at 7:49:24-7:51:02.

[40] *Id.* at 7:51:02; Ex. 4, MSP Video at 10:00.

[41] *Id.* from 10:00; Ex. 5, CC Video from 7:51:01.

[42] Ex. 4, MSP Video at 10:25

[43] *Id.* at 10:30.

[44] *Id.* at 10:33; Ex. 21,  Wurtz Dep. at 17:14-19; Ex. 9, Juell Dep. at 123:19-124:7.

[45] Ex. 4, MSP Video at 10:36.

[46] *Id.*

thought Serbus had a gun.[47]   Lund admittedly fired that single shot at Serbus to protect

Pfister, himself and the other officers.[48]   After that first shot, Serbus continued to maintain

Pfister's body in between his own and the tactical array of officers[49] until Pfister separated

from Serbus and attempted to follow Lund's commands to get on the ground.[50]

Immediately after Lund's command, Pfister got nearly to a seated position on the surface of

Highway 212, before Serbus pulled her back up and forced her to resume her position as his

body armor.[51]   Roughly nine seconds later, Lund questioned whether Serbus had a gun or a

knife.[52]   During his deposition, Lund testified that from a distance a gun would be more

dangerous to him than a knife, but added: "to Dawn Pfister no" because Serbus was in close

proximity to her.[53]   Serbus then showed officers he held a knife.[54]

Lund clearly announced Serbus had a knife,[55] and, as the video shows, the officers

allowed Serbus time – 16 seconds while Serbus was in striking proximity to Pfister – before

taking action.[56]   During those 16 seconds, while the officers were contemplating their

---

47 Ex. 11, Lund Dep. at 34:22.

48 *Id.* at 42:1-17.

49 Ex. 4, MSP Video from 11:16-11:27.

50 *Id.* at 11:27-11:30;  Ex. 12, Pearce Dep at 111:11-17; Ex. 9, Juell Dep. at 149:7-17; Ex. 14, Godinez Dep. at 75:17-76:15; Ex. 15, Bramwell Dep. at 33:17-22; Ex. 16, Bengston Dep. at 30:10-23; Ex. 17, Hamilton Dep. at 43:22-25; Ex. 18, Fogarty Dep. at 56:21-21;. Ex. 19, Meyer Dep. at 66:20-67:7; Ex. 20, N. Mueller Dep. at 37:12-23 and 39:7-18; Ex. 21, Wurtz Dep. at 22:16-23:9; Ex. 11, Lund Dep. at 77:16-78:5; and Ex. 1, Ijames Dep. at 68:6-15.

51 Ex. 4, MSP Video at 11:31; Ex. 16, Bengston Dep. at 31:14-21; Ex. 20, N. Mueller Dep. at 39:7-18; Ex. 21, Wurtz Dep. at 23:5-14; Ex. 24, Lund Statement at 12; and Ex. 1, Ijames Dep. at 68:6-8.

52 Ex. 4, MSP Video at 11:37-11:39.

53 Ex. 1, Lund Dep. at 34:3-11.

54 Ex. 4, MSP Video at 11:40.

55 *Id.* at 11:40.

56 *Id.* at 11:40-11:56;  Ex. 1, Ijames Dep. at 67:14-22.

options and letting the scene play out, Serbus was given commands.[57]  Lund said to Serbus:

"come on, drop it, drop it…"[58]  In his deposition, Lund agreed he lowered the level of

urgency in his voice at that time.  He explained his excitement level ratcheted down because

he realized Serbus had a knife and not a gun.[59]  Lund explained he had "more time" to "pick

a new solution" because Serbus did not have a gun.[60]  Further, Lund warned Serbus: "don't

do that to her – don't!"[61] as Serbus gestured toward Pfister.  Lund expressed additional

concern for Pfister stating: "He's going to stab her."[62]  Then, Serbus guided Pfister out from

the shoulder into the right-most lane of eastbound Highway 212, still with her positioned in

between him and the eleven officers.[63]  Pfister was visibly unsteady on her feet.[64]  Worried

for Pfister's safety, Lund stated: "I gotta drop him guys"[65]  and the first volley of multiple

shots rang out.[66]  Five shots were fired at this time,[67] all of which were fired at Serbus to

protect Pfister.[68]  During a momentary pause in the shots, Lund warned: "watch her, watch

her."[69]  Lund was "doing [his] best to make sure that the victim was not harmed."[70]  Six

additional shots were then fired at Serbus.[71]  At the end of this volley, blood can be seen

---

[57] Ex. 4, MSP Video at 11:40-11:56.
[58] *Id.* at 11:43-11:45.
[59] Ex. 11, Lund Dep. at 35:1-19.
[60] *Id.* at 35:1-22; 100:6-12.
[61] Ex. 4, MSP Video at 11:47-49.
[62] *Id.* at 11:50.
[63] *Id.* at 11:53.
[64] *Id.* at 11:53.
[65] *Id.* at 11:54.
[66] *Id.* at 11:56-12:00.
[67] *Id.*
[68] Ex. 11, Lund Dep. at 55:5-25.
[69] Ex. 4, MSP Video at 12:00
[70] Ex. 11, Lund Dep. at 99:8-13.
[71] Ex. 4, MSP Video at 12:02-12:09.

exploding from Serbus' head[72] and he dropped to the ground,[73] pulling Pfister down with

him.[74]  Lund testified at his deposition he fired his shots two through five to "eliminate the

threat" of Serbus and the threatened group included Pfister.[75]  Officers agreed Pfister was

the individual in the most danger from the knife because of her proximity to Serbus[76] and

because he would not let her go.[77]  Shots two through four occurred while Serbus and

Pfister were face to face and it appeared Serbus was stabbing Pfister in the stomach,[78] while

Lund's fifth shot occurred when Serbus opened up and provided better positioning.[79]  Juell

also fired during this first volley of shots.[80]  None of these eleven shots hit Pfister.[81]  After

Serbus and Pfister fell to the ground, an officer calmly announced "suspect is down, she's

**holding** the knife."[82] (emphasis added).

While Serbus and Pfister were on the ground, Pearce, followed by Juell approached

from the left, as shown in the MSP still frame below.[83]  Pearce, dressed in the white shirt and

holding the body bunker and handgun,[84] was the closest to Pfister and Serbus.[85]  It should

be noted that Pearce is an experienced officer.  He was a sniper team leader, entry team

---

[72] *Id.* at 12:09.
[73] *Id.* at 12:10.
[74] *Id.*
[75] Ex. 11, Lund Dep. at 55:5-25
[76] *Id.* at 34:3-11;  Ex. 12, Pearce Dep. at 85:20-86:3; Ex. 20, N. Mueller Dep. at 31- 32:5.
[77] Ex. 31, Hamilton Statement at 8.
[78] Ex. 11, Lund Dep. at 57:6-15; Ex. 4, MSP Video at 11:48-12:00.
[79] *Id.* at 12:00-12:11; Ex. 11, Lund Dep at 55:9-13.
[80] Ex. 9, Juell Dep. at 82:8-94:3.
[81] Ex. 11, Lund Dep. at 73:22-23; Ex. 2, Pfister Autopsy.
[82] Ex. 4, MSP Video at 12:17-18.
[83] *Id.* at 12:17-12:18.
[84] Ex. 12, Pearce Dep. at 100:15-17.
[85] *Id.*

leader and Command Sergeant on SWAT.[86]  Juell can be seen holding the rifle in the still

frame below.



Serbus was still alive,[87] and Pfister managed to wrestle the knife away from him.[88]  She then

turned away from him to her left[89] and partially rose from the ground[90] – two actions that

are depicted in the still frames from both the MSP and Carver County videos:

---

[86] *Id.* at 14:1-22.
[87] Ex. 4, MSP Video at 12:25 (Serbus rises, takes back the knife and is shot dead.)
[88] *Id.* at 12:15-20; Ex. 5, CC Video at 7:53:18-22.
[89] *Id.* at 07:53:22; Ex. 4, MSP Video at 12:20.
[90] *Id.* at 12:22; Ex. 5, CC Video at 07:53:25.







As shown in the Carver County still frames, Pfister and Serbus remained surrounded by

eleven armed officers.[91]  It was at this time, as Pfister turned away from Serbus with the

knife in her hand, that Juell shot Pfister four times[92] – including once in the back.[93]  The

entire sequence from the point Pfister had wrenched the knife away from Serbus, turned

away from him and partially rose took only a couple of seconds,[94] during which a few

commands were given to Pfister.[95]  Juell's four shots were fired immediately thereafter and

were all fired within one second.[96]  Juell disputes that he shot Pfister four times, including

---

[91] *Id.* at 07:53:23.
[92] *Id.* at 07:53:25;  Ex. 4, MSP Video at 12:23-24.
[93] Ex. 2, Pfister Autopsy.
[94] Ex. 5, CC Video at 7:53:21-7:53:23; Ex. 4, MSP Video at 12:20-23
[95] *Id.* at 12:19-12:22.
[96] Ex. 5, CC Video at 7:53:25.

once in the back[97] despite: 1) forensic medical evidence to the contrary;[98] 2) his own admission that he was the only one who fired a .223 rifle that day;[99] 3) forensic evidence collected from the scene by the BCA, noting the same;[100] and 4) testimony of his own expert.[101]

Juell's shooting of Pfister, her positioning and the progression of her collapse are depicted in the following still frames from the Carver County Video:



[97] Ex. 9, Juell Dep. at 43:10-13; 45:4-5.
[98] Ex. 25, Dr. Andrew Baker Video Dep. at 65:11-86:12.
[99] Ex. 9, Juell Dep. at 43:14-16.
[100] Ex. 22, Examination of Physical Evidence.
[101] Ex. 1, Ijames Dep. at 58:3-10.









The following photograph from the MSP Video shows Juell's initial positioning when he shot Pfister.



Juell backed even further from her while he continued shooting, increasing the distance between them.[102]  The video of the incident and still frames therefrom show Pfister was not to her feet when she was shot by Juell.[103]  She had not reached a standing position.  She did

---

[102] Ex. 4, MSP Video at 12:23-12:24.
[103] *Id.* at 12:23; Ex. 5, CC Video at 7:53:25; Ex. 12, Pearce Dep at 72:3-23; Ex. 15, Bramwell Dep. at 42:13-20; Ex. 19, Meyer Dep. at 85:7-9; Ex. 17, Hamilton Dep. at 37:18-23; and Ex. 18, Fogarty Dep. at 72:19-20.

not advance on the officers,[104] move aggressively toward any of the officers,[105] or attack them with the knife.[106]  Numerous officers who were at the scene, as well as Juell's expert Ijames, agreed.

A split-second after Pfister was shot and killed, Serbus rose to a seated position and grabbed the knife.[107]  He was shot numerous times.[108]

### III.    Defendant Juell, the Objectively Unreasonable Officer

In use of force and shoot/no shoot situations, officers are trained to apply as much calm and measured behavior that they can.[109]  Officers are also trained to focus on the facts in front of them and to not build drama into any call.[110]  This is especially important when adrenaline is running high,[111] such as during a prolonged pursuit or a deadly force situation. Further, officers are trained to not be prejudiced towards shooting[112] and to allow events to unfold before making deadly force decisions.[113]  As Pearce noted, this training works better for some than others.[114]  Here, a litany of incorrect assumptions and exaggerations and

---

[104] Ex. 4, MSP Video at 12:23; Ex. 5, CC Video at 7:53:25; Ex. 12, Pearce Dep. at 91:1-7; Ex. 16, Bengston Dep. at 64:12-14; 69:1-10; Ex. 17, Hamilton Dep. at 37:24-38:4; and Ex. 18, Fogarty Dep. at 117:10-11.

[105] Ex. 4, MSP Video at 12:23; Ex. 5, CC Video at 7:53:25.

[106] *Id.* at 7:53:25; Ex. 4, MSP Video at 12:23.

[107] *Id.* at 12:25.

[108] *Id.* at 12:28.

[109] Ex. 12, Pearce Dep. at 24:19-25:6; Ex. 18, Fogarty Dep. at 60:19-61:7; Ex. 20, N. Mueller Dep. at 54:7-21; Ex. 1, Ijames Dep. at 31:17-22.

[110] Ex. 15, Bramwell Dep. at 45:15-46:13; Ex. 18, Fogarty Dep. at 99:1-4; Ex. 20, N. Mueller Dep. at 54:13-16; Ex. 15, Bramwell Dep. at 45:15-46:13.

[111] Ex. 12, Pearce Dep. at 24:19-25:6; Ex. 18, Fogarty Dep. at 60:19-61:7; Ex. 20, N. Mueller Dep. at 54:17-21

[112] *Id.* at 55:7-12;  Ex. 18, Fogarty Dep. at 98:11-24.

[113] *Id.* at 60:19-61:7; Ex. 12, Pearce Dep. at 33:10-15.

[114] *Id.* at 25:2-9.

unreasonable predictions, perceptions and mind reading played into Juell's unconstitutional use of deadly force on Pfister.

During the chase, Juell called out the wrong directions.[115]  He incorrectly radioed that Serbus and Pfister were African American.[116]  Juell also incorrectly identified an ice-scraper as a gun.[117]  He wrongly reported Pfister had reached out of the Saab with a handgun and even adjusted his vehicle so she did not have a shot.[118]  In reality, Pfister had an ice-scraper and was trying to push the hood of the Saab down.[119]  During the pursuit, Juell also made numerous assumptions about Serbus and Pfister – including, that they were drunk or had drugs in the car.[120]  Without any evidence, he "immediately [thought] weapons.  They're goin' for weapons or they're goin' for drugs…"[121]  Juell also assumed that, by attempting to push the hood of the Saab down, Pfister was "actively trying to help [Serbus] evade."[122]  Post-incident, Juell claimed that, through this action, Pfister had committed the crime of "aiding and abetting fleeing police in a motor vehicle."[123]  However, other officers noted Pfister could not be charged with much of anything given she was not the driver of the vehicle (and had been held hostage).[124]  Juell acknowledged it would be better if the hood

---

[115] Ex. 8, Pursuit Radio Traffic at 2:42; Ex. 7, Juell Statement at 6; Ex. 9, Juell Dep. at 59:14-17.
[116] Ex. 7, Juell Statement at 7; Ex. 8, Pursuit Radio Traffic at 2:21-2:24; Ex. 9, Juell Dep. at 59:22-24.
[117] *Id.* at 59:9-13; Ex. 7, Juell Statement at 8.
[118] *Id.*
[119] *Id.*; Ex. 9, Juell Dep. at 59:9-13.
[120] Ex. 7, Juell Statement at 7.
[121] *Id.*
[122] *Id.* at 8; Ex. 9, Juell Dep. at 17:10-17.
[123] *Id.* at 17:11-17.
[124] Ex. 12, Pearce Dep. at 75:5-17; Ex. 11, Lund Dep. at 29:1-30:1; Ex. 20, N. Mueller Dep. at 37:8-11.

was not blocking the windshield for a hostage/passenger in the vehicle.[125]  Admittedly, Juell

did not know how Pfister came to be in the Saab or the nature of her relationship with

Serbus.[126]  Nonetheless, it is clear in his statement to the BCA, the testimony in this case and

in front of the grand jury, and the way he handled the situation that Juell lumped Serbus and

Pfister together from the beginning of the encounter[127] even though she was a passenger,

not a driver, and was identified as a hostage (a fact that he manifested a belief in by shooting

at Serbus to protect her.)[128]  Juell says he assumed they were Bonnie and Clyde or

conspirators in a suicide pact and says he acted upon his assumptions.[129]

Twice in his BCA statement, Juell incorrectly described that two separate officers

were in danger of being hit by Serbus.  Juell noted Serbus was going to hit a Dodge Charger

and at the last moment swerved away.[130]  The Charger was driven by Nathan Mueller, who

never mentioned being in harm's way.   Juell also noted Serbus "look[ed] like he's goin' right

for [Pearce] and right for his cruiser."[131]  Juell described while he was driving "in [his] car

[he's] like no, no, no, no, no, no Lance run, Lance run" as Pearce was deploying stop sticks

to take out the Saab's tires.[132]  Pearce did not perceive Serbus was driving directly at him.[133]

Fogarty also denied the Saab was steered or aimed at Pearce.[134]  The video evidence dispels

---

[125] Ex. 9, Juell Dep. at 17:18-22.
[126] *Id.* at 15:20-23.
[127] Ex. 7, Juell Statement at 8;  **REDACTED**.
[128] Ex. 9, Juell Dep. at 124:17-21; Ex. 1, Ijames Dep. at 81:22-82:25.
[129] If Juell's statement was true, he shot Serbus (Clyde) to protect Pfister (Bonnie).
[130] Ex. 7, Juell Statement at 9.
[131] *Id.* at 10.
[132] *Id.* at 10.
[133] Ex. 12, Pearce Dep. at 35:19-25.
[134] Ex.18, Fogarty Dep. at 48:24-49:8.

Juell's version and corroborates Pearce and Fogarty's as shown in the still frames below

from the MNDOT footage:[135]



---





Juell's observation of Pfister and Serbus moving within the vehicle "really scared [him]."[136]  During Juell's statement to the BCA, he continually described how scared and stressed he was – his nerves were through the roof,[137] he was panicked,[138] he was so jacked up[139] and even questioned if he was ready for this.[140]  During the pursuit, Juell released his loaded rifle from where it was mounted above his head, charged it and drove with it in his lap "[b]ecause the movements scared [him] so much."[141]  Other officers testified they would not do this while driving in pursuit of a vehicle.[142]  After the Saab crashed, Juell was "so jacked up, [his] adrenaline's goin' because [he's] so scared…"[143]  He even choked himself on the seatbelt attempting to get out of his Tahoe because he forgot to unbuckle.[144]  His rifle was in his lap at this time.[145]  Juell was the opposite of calm and measured.  Pearce also noted as he walked up onto the crash scene, Juell commented about needing to shoot Serbus,[146] showing a prejudice toward shooting despite training to the contrary.

Further, contrary to police training, Juell built a lot into the call that other officers did not observe or describe afterwards.  Juell incorrectly believed he was the only person with a

---

[136] Ex. 7, Juell Statement at 7.

[137] *Id.*

[138] *Id.* at 7-11.

[139] *Id.* at 11.

[140] *Id.*

[141] *Id.* at 4 and 8;  Ex. 9, Juell Dep. at 60:21-61:8.

[142] Ex. 20, N. Mueller Dep. at 51:24-52:6; 53:15-17; Ex. 15, Bramwell Dep. at 44:17-45:14; Ex. 16, Bengston Dep. at 29:8-15.

[143] Ex. 7, Juell Statement at 11.

[144] *Id.*

[145] *Id.*

[146] Ex. 12, Pearce Dep. at 4:16-5:10;  Ex. 10, Pearce Statement at 8.

rifle.[147]  In fact, there were 4 rifles and 7 handguns pointed at Serbus.[148]  Juell also stated to

the BCA: "I – visually I [saw Serbus] reaching for a gun."[149]  There was no gun to be seen.[150]

Instead, Serbus had a knife – one that Juell described as a "big black handled knife" with a

"big silver blade."[151]  The other officers admitted it was not a huge knife – it was a folding

knife with a 3 ¼ inch blade,[152] as pictured below:



---

[147] Ex. 7, Juell Statement at 12.
[148] Ex. 9, Juell Dep. at 76:25-77:11; Ex. 1, Ijames Dep. at 54:9-18.
[149] Ex. 7, Juell Statement at 12.
[150] Ex. 1, Ijames Dep. at 47:24-48:8.
[151] Ex. 7, Juell Statement at 14.
[152] Ex. 12, Pearce Dep. at 39:8-15; Ex. 17, Hamilton Dep. at 82:18-24; Ex. 20, N. Mueller Dep. at 33:9-13; Ex. 1, Ijames Dep. at 61:20-21.

At the scene, Juell failed to perceive Pfister was dragged out of the Saab by Serbus[153] and that she went to the ground following Lund's commands to do so.[154]  After he was shown the video evidence, he agreed Serbus helped Pfister out of the vehicle[155] and that she did attempt to go to the ground as shown in the photo below:[156]



Juell also misperceived that Serbus was hit numerous times during the first fourteen second volley.[157]  Juell believed that, despite these "hits," Serbus was not going down[158] and

---

[153] Ex. 9, Juell Dep. at 38:14-19; Ex. 7, Juell Statement at 13.
[154] Ex. 9, Juell Dep. at 19:14-19.
[155] *Id.* at 38:17-24.
[156] *Id.* at 19:14-19.
[157] Ex. 4, MSP Video from 11:56-12:09.
[158] Ex. 7, Juell Statement at 13.

attributed Serbus' ability to remain standing to drugs and being zombie-like.[159]  Even when

confronted with Serbus' autopsy report and the BCA's Examination of Physical Evidence, it

took Juell numerous pages of deposition testimony to expose the number of times he

actually shot Serbus.[160]  Serbus was only hit seven times total, including at least 3 times *after*

Pfister was killed.[161]  Juell acknowledged to the BCA that someone called out that it was a

hostage situation[162] and admitted he shot Serbus "to protect her."[163]  But Juell now

steadfastly claims he never thought Pfister was a hostage.[164]  Further, contrary to every other

officer at the scene, he claimed he was closest to Pfister[165] which is belied by the video

evidence.

Five days after the shooting and after consulting with his criminal defense lawyer,

Juell claimed to have ascertained extensive knowledge regarding Pfister's intent from her

facial expressions before he fired.  He described to the BCA:

> [S]he's got the meanest, angriest look on her face.  Like, 'You fuckers just
> killed by boyfriend', or whatever, 'you killed him...' you could see it on her
> face.  'You fuckers, I'm gonna kill you.'  You could see it on her face and she
> started to get up at us and she started to get up and I knew why she was
> getting' up.  I knew why she was getting' up, she was gonna take that knife and
> she was gonna try to stab us.  She's gonna try to kill us...[166]

And

---

[159] *Id.* at 12; Ex. 9, Juell Dep. at 122:11-14.

[160] *Id.* at 82:8-94:3.

[161] Ex. 28, Serbus Autopsy; Ex. 4, MSP Video.

[162] Ex. 7, Juell Statement at 13.

[163] *Id.*

[164] Ex. 9, Juell Dep. at 124:14-16.

[165] Ex. 1, Ijames Dep. at 59:22-24; Ex. 9, Juell Dep. at 79:17-80:8; Ex. 7, Juell Statement at 18.

[166] *Id.* at 14.

> With that look on her face, she just had the meanest look, there was no misinterpreting what she was gonna do.[167]

Apparently, Juell is a mind reader.[168]  While other officers admitted Pfister did not say anything[169] and they cannot read minds,[170] Juell conjured up something from Pfister's face and made a deadly force decision from his subjective and predictive mindreading.[171]  Pearce, the officer closest to Pfister when she was shot, testified that no facial expression stuck out.[172]  According to Pearce, her face was "emotionless,"[173] which is not surprising given autopsy showing Pfister suffered blunt force injuries to her head, including a subarachnoid hemorrhage over her left temporal lobe and left cerebellum.[174]  If the jury believes Pearce on this point, Juell's shooting justification becomes not only unreasonable, but incredible.

Most importantly, Juell misperceived Pfister's actions once she got the knife away from Serbus.  In his BCA statement, he claimed:

- ▪ Pfister started to get up at us;[175]
- ▪ She was comin' up at us;[176]
- ▪ She came up at us;[177]
- ▪ She reached over and grabbed it and came up;[178]
- ▪ She was comin' up at us;[179]

---

[167] *Id.* at 17.
[168] *Id.* at 17-18.
[169] Ex. 18, Fogarty Dep. at 87:17-18.
[170] *Id.* at 79:3; Ex. 16, Bengston Dep. at 59:2-5; Ex. 15, Bramwell Dep. at 46:22-47:1; Ex. 21, Wurtz Dep. at 44:22-24.
[171] Ex.9 Juell Dep. at 104:24-105:4.
[172] Ex. 12, Pearce Dep. at 105:15-19.
[173] *Id.* at 110:4-10.
[174] Ex. 2, Pfister Autopsy.
[175] Ex. 7, Juell Statement at 14.
[176] *Id.*
[177] *Id.* at 16.
[178] *Id.*
[179] *Id.*

- ▪ She posted and started comin' up I'm like 'ed, she's gonna kill us;[180] and
- ▪ I saw her grab that knife off his chest and come up at, at me.[181]

During his grand jury testimony, Juell went a step further when describing Pfister's actions,

stating:                               **REDACTED.** [182]

He also incredibly testified to the grand jury                               **REDACTED**. [183]

**REDACTED**.                               Other officers testified that the knife made the situation less

dangerous and gave them more time or other options.[184]  Hence the saying: "Don't bring a

knife to a gunfight."  At his deposition, Juell went further, claiming Pfister attacked him with

a knife:

> 14 Q You consider this a knife attack?
> 15 **A What Dawn Pfister did?**
> 16 Q Yep.
> 17 **A Yes.**[185]
> …
> 6 Q Well, do you claim that Dawn Pfister attacked
> 7 you with a knife?
> 8 **A Yes.**[186]

Juell also testified at his deposition he was "100 percent" sure Pfister attacked him with the

knife,[187] he was "100 percent" sure he only fired two or three times at Pfister,[188] and he was

---

[180] *Id.* at 17.

[181] *Id.*

[182] **REDACTED**.

[183] **REDACTED**.

[184] Ex. 12, Pearce Dep. at 104:23-105:6; Ex. 17, Hamilton Dep. at 28:4-11; Ex. 18, Fogarty 84:18-25;  Ex. 11, Lund Dep. at 35:1--22 and 100:6-12.

[185] Ex. 9, Juell Dep. at 35:14-17.

[186] *Id.* at 36:6-8.

[187] *Id.* at 128:25-129:2.

[188] *Id.* at 129:6-8.

"100 percent" sure he did not shoot Pfister in the back.[189]  In fact, each of these claims are 100 percent wrong.[190]

Juell's testimony regarding the "knife attack" by Pfister is as absurd as his testimony that he never misses with a firearm.  In fact, he has missed 37 out of the 44 shots he has taken in the line of duty –84% of the time.  This includes 29 shots Juell dangerously fired with an MP5 into and through a mobile home in a mobile home park without an acquired target in 2001.[191]  The video evidence of the February 7, 2014 incident, other officers' testimony and the forensic evidence clearly contradicts Juell's version of Pfister's actions. The video showed Pfister, the hostage, had three appendages on the ground[192] when she was shot by Defendant Juell.[193]

     a. *Juell's entire construct relies on a subjective belief, or worse – claimed predictions – of what Pfister <u>was going</u> to do with a 3 ¼ inch folding knife to 11 armed officers with weapons aimed at Pfister and Serbus.*

Throughout Juell's version of the events, including his statement to the BCA and his memorandum in support of summary judgment, he relied on his own subjective belief or prediction of what Pfister was going to do.  In his statement, Juell claimed:

- She's gonna try and kill us with that knife;[194]
- She was gonna be the same…I knew that there's a good chance this rifle wouldn't even stop…;[195]
- She was gonna take the knife and she was gonna try to stab us;[196] and

---

[189] *Id.* at 129:3-5.
[190] Ex. 1, Ijames Dep. at 58:3-6; Ex. 2, Pfister Autopsy.
[191] Ex. 9, Juell Dep. at 22:18-29:15
[192] Ex. 20, N. Mueller at 29:8-11
[193] Ex. 4, MSP Video at 12:20-12:24; Ex. 5, CC Video at 7:53:22-7:53:25.
[194] Ex. 7, Juell Statement at 14.
[195] *Id.*
[196] *Id.*

▪ I know what she's gonna do, she's gonna come up and stab us with that knife.[197]

During his grand jury testimony, Juell **REDACTED**:


**REDACTED**.[198]


At his deposition, when pressed that it was impossible for him to know what Pfister was **going to do**, Juell testified: "I knew what she was going to do. It appeared to me what she was going to do, yes." He again attributed his ability to "know" this from "[j]ust her actions and her face."[199] Within his memorandum, the future tense is used: "Juell thought Pfister **was going to** try to stab officers and kill them with the knife…"[200] and "Juell believed if Pfister got to her feet, she was **going to** stab one of them."[201] These apocalyptic or grandiose predictions that litter Juell's version of the events do not provide justification for shooting Pfister. Officers must let the events unfold and react to those that actually occur, not the ones conjured up in their mind's eye.[202] It is objectively unreasonable for an officer to base a decision to shoot someone on the ground with a small folding knife upon the officer's subjective belief as to what the individual was going to do or a subjective belief about what the individual's facial expression said. Defense expert Ijames agrees.[203]

---

[197] *Id.*
[198] **REDACTED**.
[199] Ex. 9, Juell Dep. at 128:20-22.
[200] Defendant's Memorandum in Support of Summary Judgment, ECF Doc. No. 51 at 7.
[201] *Id.*
[202] Ex. 1, Ijames Dep. at 89:2-5.
[203] *Id.* at 75:19-22.

b. *Pfister never advanced on or attacked law enforcement despite Juell's subjective prediction that she would and all other officers voted with their trigger fingers <u>not to shoot</u>.*

Juell's subjective predictions regarding Pfister's actions were fatally premature – Pfister did not get fully to her feet, she did not advance on the officers and she did not attack anyone with the knife.  Officers conceded these facts when questioned at their depositions.  Perhaps most importantly, Pearce, the closest officer to Pfister, testified she never completely stood up,[204] never got closer to him,[205] always had her left hand on the ground[206] and if she had approached him he would have shot her.[207]  Pearce, the experienced sniper and SWAT officer, did not fire his weapon that day,[208] although the screenshots on pages 15 and 19 herein depict him in a shooting stance, aiming his pistol so that he could have shot if it **became** necessary.  Pearce noted Serbus was the deadly threat, while Pfister was the hostage.[209]  Bramwell, Hamilton and Meyer testified Pfister never got to a standing position when she had the knife.[210]  Bengston and Hamilton agreed Pfister's head never got closer to Juell and Pearce.[211]  Bengston went further and testified the video showed Pfister did not close the distance between her and law enforcement while she was holding the knife.[212]  Hamilton agreed Pfister did not advance or close the distance between her and

---

[204] Ex. 12, Pearce Dep. at 72:3-23.
[205] *Id.* at 91:1-4.
[206] *Id.* at 92:3-7.
[207] *Id.* at 92:3-94:14.
[208] *Id.* at 70:19-22.
[209] *Id.* at 99:17-100:6.
[210] Ex. 15, Bramwell Dep. at 42:13-20; Ex. 19, Meyer at 85:7-9; Ex. 17, Hamilton Dep. at 37:18-23.
[211] Ex. 16, Bengston Dep. at 64:12-14; Ex. 17, Hamilton Dep. at 37:18-23; 60:3-7.
[212] Ex. 16, Bengston Dep. at 69:1-10.

33

officers[213] and, in fact, asserted Juell was moving away from Pfister when he shot her.[214] Fogarty testified to the grand jury that **REDACTED**.[215]


**REDACTED**. [216]


However, at his deposition in this matter and after he was confronted with the video evidence, Fogarty stated Pfister was never "[f]ully erect"[217] and "[s]he did not" come at him.[218]  Also, in direct contradiction to his grand jury testimony, at his deposition Fogarty agreed he had a clear line of sight and could have shot, but did not ever shoot at Pfister.[219] He would have fired if he was faced with an immediate threat of serious bodily harm or death to himself or others.[220]  Fogarty's grand jury testimony on this point was not true. Juell's expert Ijames agreed.[221]

Nathan Mueller noted that Pfister's face turned towards his vehicle housing the Carver County Squad camera, putting her back towards Pearce and Juell when she was shot.[222]  Like Pearce and Fogarty, N. Mueller testified if Pfister was a threat, he would have shot her.[223]  He only voted "yes" with his trigger finger as to Serbus on February 7, 2014

---

[213] Ex. 17, Hamilton Dep. at 37:18-38:4.
[214] *Id.* at 37:18-38:4.
[215] **REDACTED**.
[216] **REDACTED**.
[217] Ex. 18, Fogarty Dep. at 72:19-20.
[218] *Id.* at 117:10-11.
[219] *Id.* at 73:9-22.
[220] *Id.* at 85:1-6.
[221] Ex. 1, Ijames Dep. at 79:13-80:11.
[222] Ex. 20, N. Mueller Dep. at 31:17-24
[223] *Id.* at 47:1-3; 58:25-59:3.

### IV.   Juell's Expert Stephen Ijames' Testimony Supports the Conclusion that Juell was the Objectively Unreasonable Officer on the Scene

Notably, Juell failed to cite his expert in his memorandum supporting summary judgment based upon qualified immunity.  This is likely because Ijames provided testimony that was damning to his case, including that Defendant Juell was the singular outlier when compared to the other ten officers at the scene.[224]  Plaintiff intends to use Ijames in his case-in-chief at trial.[225]

The main takeaways from Ijames' deposition were:

1.  A number of Juell's statements turned out to be factually untrue;

2.  Juell made a number of misperceptions or post-incident exaggerations that no other officer observed at the scene or could stick with after being confronted with the video evidence (Ijames included);[226] and

3.  Juell saw things that were simply not there and reacted to stimuli that did not exist, which is unreasonable.[227]

As such, Defendant Juell is the objectively unreasonable officer.

According to Ijames, Juell's claim that Serbus or Pfister had a gun was a "complete misperception" and one that was not objectively reasonable.[228]  Further, Juell's belief that he was the only one at the scene with a rifle was *another* misperception on his part.[229]  The knife that Serbus did have was a folding knife, not a big knife by any common standard.[230]  Ijames

---

[224] Ex. 29, Chart Showing Juell as Outlier; Ex. 1, Ijames Dep. at 53:14-54:7.
[225] Plaintiff's expert John Ryan provides even more damning testimony and will also be called in Plaintiff's case-in-chief.
[226] Ijames Dep. at 73:24-74:10.
[227] *Id.* at 89:10-17.
[228] *Id.* at 51:4-52:4.
[229] *Id.* at 54:9-18.
[230] *Id.* at 60:10-61:21; 62:2-13.

also agreed with Pearce, Fogarty and Lund – he too would rather be facing a knife than a gun.[231]  Ijames testified a knife is safer when you are not in close proximity to it.[232]  Ijames admitted Juell erroneously believed Serbus was being hit multiple times without having an effect.[233]  Further, Ijames testified it is "factually untrue" that Juell never misses with his AR-15[234] and Juell *again* misperceived he was closer to Pfister than Pearce when he shot her.[235]

Ijames also provided problematic testimony regarding Juell's shooting of Pfister.  He agreed an officer cannot conjure up something in Pfister's mind and act on that subjective belief – i.e., an officer cannot make a use-of-deadly-force decision based on a subjective belief about what a person is thinking.[236]  That is exactly what Juell claims he did.  Ijames admitted that Juell's feelings regarding what Pfister's expression "said" were subjective feelings at best, and lies at worst[237] and that it is objectively unreasonable to shoot someone based on an angry face that supposedly provides insight into their intent.[238]  Ijames also testified Pfister turned away from Serbus when she grabbed the knife[239] and that she never physically moved forward.  In regards to the shooting of Serbus, Ijames agreed the officers waited 16 seconds before firing on him after he showed the knife and only shot when they believed Pfister was in jeopardy due to her proximity to Serbus and Serbus' stabbing

---

[231] *Id.* at 87:10-18.
[232] *Id.* at 87:10-18.
[233] *Id.* at 56:18-57:12.
[234] *Id.* at 56:12-15; 60:4-13.
[235] *Id.* at 59:15-60:1.
[236] *Id.* at 41:24-42:23.
[237] *Id.* at 70:23-71:7.
[238] *Id.* at 75:19-22.
[239] *Id.* at 40:10-14.

movements at her.[240]  When Juell shot Pfister, Pearce and Juell had retreated and were

retreating, thereby decreasing their proximity to the knife.[241]  Ijames also noted Pfister did

not make the same kind of menacing, waving, and stabbing motions as Serbus did when he

held the knife and was shot.[242]  Ijames did not disagree that Pfister's positioning when she

picked up the knife could be consistent with trying to throw the knife.[243]  Further, according

to Ijames, it was obvious Juell believed Pfister was a hostage at some point during the

February 7, 2014 encounter.  For Juell to say otherwise is inconsistent with his actions.

Ijames testified as follows:

> 25 …**I know his words say that she's not a**
> 1 **hostage, but there's no legal justification to shoot**
> 2 **the man with the knife if you don't perceive the person**
> 3 **in front is in immediate jeopardy.**
> 4 Q Well, I know. But I --
> 5 **A But I agree with you --**
> 6 Q -- both mean something. He said he never --
> 7 **A I agree.**
> 8 Q -- thought she was a hostage.
> 9 **A I agree with that. I'm just saying the**
> 10 **practical side is when you shoot the person holding**
> 11 **her, your actions sure indicate you believe that she's**
> 12 **being held and in deadly jeopardy.**
> 13 Q So it's the words that would be the lie under
> 14 oath?
> 15 **A Well, the actions seem to indicate that**
> 16 **that's in conflict.**
> 17 Q The -- his actions, if they speak louder than
> 18 words, would trump the words.
> 19 **A There's no doubt about that. There's a lot**
> 20 **more to shooting at someone than talking about the**
> 21 **circumstance.**
> 22 Q But given the opportunity to testify

---

[240] *Id.* at 63:8-64:6; 67:10-21.

[241] *Id.* at 70:10-20;88:2-8

[242] *Id.* at 63:23-64:13.

[243] *Id.* at 91:9-12.

23 truthfully under oath, he chose some other -- he chose
24 the opposite on that point, correct?
**25 A That's his statement, yes, sir.**[244]

Juell found himself trapped.  He had to claim Pfister was not a hostage because, in the end, he shot her.[245]  His actions contradict his post-incident claim.  Juell's description of Pfister's actions and his subjective feelings (*or lies*) regarding her expression cannot save him – especially when the video evidence, his own expert and numerous officers directly contradict his version of the events.

## LEGAL STANDARD

Under Fed. R. Civ. P. 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  When considering a motion for summary judgment, the court must view the facts and inferences in the light most favorable to the non-moving party. *Boerner v. Brown & Williamson Tobacco Corp.*, 260 F.3d 837, 841 (8th Cir. 2001).  The court must disregard any evidence favoring the moving party that the jury is not required to believe.  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).  Where a reasonable inference can be drawn from the evidence, that inference creates a genuine issue of material fact and summary judgment is inappropriate and should be left for the fact finder to decide what inferences to believe.  *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999).

The plaintiff must show the following to overcome the shield from suit: "(1) the facts, viewed in the light most favorable to the plaintiff, demonstrate the deprivation of a constitutional or statutory right; and (2) the right was clearly established at the time of the

---

[244] *Id.* at 81:25-82:25.
[245] *Id.* at 57:24-59-3.

deprivation." *Howard v. Kansas City Police Dep't*, 570 F.3d 984, 988 (8th Cir. 2009). When the

use of excessive force is the claimed constitutional violation, as it is here, the case is analyzed

under the Fourth Amendment's "objective reasonableness" standard. *Graham v. Connor*, 490

U.S. 386, 288 (1989). "The reasonableness of a use of force turns on whether the officer's

actions were objectively reasonable in light of the facts and circumstances confronting him,

without regard to his subjective intent or motivation." *Loch v. City of Litchfield*, 689 F.3d 961,

965 (8th Cir. 2012) (citing *Graham*, 490 U.S. at 397). Police must consider the "totality of the

circumstances" when deciding whether the use of deadly force is justified. *Tennessee v. Garner*,

471 U.S. 1, 8-9 (1985). Evaluating the totality of the circumstances is an inherently factual

inquiry and, to do so, the Court must consider the "severity of the crime at issue, whether

the suspect poses an immediate threat to the safety of officers and others, and whether [she]

is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396.

The second step of the inquiry regarding the applicability of qualified immunity is

also "fact-intensive…and must be under taken in light of the specific context of the case, not

as a broad general proposition." *Samuelson v. City of New Ulm*, 455 F.3d 871, 875 (8th Cir.

2006) (internal quotations omitted). "A right is clearly established if, at the time of the

challenged conduct, 'every reasonable official would have understood that what he [was]

doing violate[d] that right.'" *Wallace v. City of Alexander*, 2016 WL 7174116 at *4 (8th Cir.

Dec. 9, 2016) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). The United States

Supreme Court just recently reiterated "the longstanding principle that 'clearly established

law' should not be defined 'at a high level of generality.'" *White v. Pauly*, 580 U.S. --, 2017

WL 69170 at *6 (S. Ct. Jan. 9, 2017) (quoting *Ashcroft*, 563 U.S. at 742). Instead, "the clearly

established law must be 'particularized' to the facts of the case." *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

## ARGUMENT

The deadly force Juell used on Pfister on February 7, 2014 was objectively unreasonable given the totality of the circumstances under the standard enunciated in *Graham v. Connor* and *Tennessee v. Garner*.  Further, Juell is not entitled to qualified immunity for his actions under *Saucier v. Katz*, 533 U.S. 194 (2001).  No reasonable officer in Juell's position would have believed it was lawful to shoot Pfister and the caselaw supports the conclusion that Juell acted objectively unreasonably in doing so.  For these and other reasons outlined in this memorandum, summary judgment is inappropriate and Juell's motion should be denied.

### I.  Juell's Version of the Incident Blatantly Contradicts the Video, the Undisputable Forensic Evidence, the Sworn Testimony, and the Actions of Ten Other Officers at the Scene and Should Be Disregarded

Juell's version of the incident comes from: 1) his statement to the BCA, which was not provided under oath and took place five days after the incident and after preparation with his defense lawyer; 2) his Grand Jury testimony, which he believed would remain secret; and 3) his deposition testimony.  His story has evolved over time and as it evolved it has increasingly deviated from the video evidence.  He attempts to bolster his version of the incident by citing the other officers' BCA statements, which as stated before, are riddled with a host of problems, including that many of the officers were not shown the video of the incident prior to giving their statements.  Further, the BCA agent's leading questions appear

designed to get a specific answer – one that matched BCA Special Agent Scott Mueller's

version provided to the Hennepin County Medical Examiner, including in pertinent part:

> The male fell to the ground with the knife.  The dec **ran over** to the dec,
> grabbed the knife from him, and **then began advancing towards law**
> **enforcement with it**.  She was promptly shot upon her **approach**.[246]

Also, Juell's memorandum only explains snippets of the officers' deposition testimony,

which fail to adequately present their recanting of their statements to the BCA on key

portions of the incident – namely, whether Pfister advanced or closed the distance between

herself and Juell and whether she posed an immediate significant threat at the time she was

shot.

   All of Juell's versions of the event contradict the video evidence, presenting more

than a wrinkle in the facts he laid out in his motion for summary judgment.  The jury in

deciding the facts will have to determine which testimony to believe: it "may believe all of

what a witness said, or only part of it, or none of it." Eighth Circuit Model Jury Instruction

3.4.  Because Juell's version of the incident diverges from the video and other evidence on

issues key to whether he would be charged criminally or held civilly liable, and not just in

small details, the jury will likely question if Juell has provided intentional falsehoods.  *Id.*

Further, there are no allegations or any indications that the video was altered in any way.

The video evidence was obtained from Lund's and N. Mueller's squad cars and remained in

the police's or BCA's possession until Plaintiff's attorneys were provided an un-redacted

copy.  Because the video and undisputed forensic evidence tell a different story from that

presented by Juell, his version should not be adopted by this Court. *Scott v. Harris*, 550 U.S.

---

[246] Ex. 30, Hennepin County Medical Examiner Main Narrative at 1 (emphasis added).

372, 380 (2007) ("[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.")

## II.     Juell Violated Pfister's Constitutional Right to be Free From Excessive Force

The apprehension by the use of deadly force is a seizure subject to the reasonableness requirement under the Fourth Amendment. *Tennessee v. Garner*, 471 U.S. 1, 7 (1985).   Under the totality of the circumstances, it is clear Juell acted unreasonably when he shot Pfister and he therefore violated Pfister's Fourth Amendment right to be from excessive force.   The facts of this case contain the roadmaps for both the constitutional propriety of shooting a suspect armed with a small-folding knife – close proximity to and movements of slicing or stabbing at a victim – and for the impropriety of doing so when a smaller person, visibly unsteady on her feet who was a hostage a moment before with bullets flying around her, and who is not proximate and has said and done nothing violent or threatening to anyone, let alone to 11 armed officers surrounding her.   In the first situation the four shooting officers are accorded qualified immunity; in the latter, the sole outlier shooter is objectively unreasonable and is not.

Pfister could not be charged with a severe crime.   While Serbus could have been charged with the felony of fleeing the police, Pfister, was only a passenger in the vehicle (not the driver) and could not be charged with the same.   The severity of any crime Pfister committed was nonexistent at best and negligible at worst.   Further, Pfister did not resist or attempt to flee.   Nor did she pose an immediate threat to Juell or others.   This is an objective inquiry and is not to be based on Juell's subjective view.   Juell's testimony and arguments

42

regarding his fear and his subjective (and impossible) mind reading of Pfister's blank face and her intentions are not determinative. Additionally, Juell's version of the facts, including the number of times he shot Pfister and his claim that he did not shoot her in the back, are blatantly contradicted by the video (and autopsy) and must be disregarded. *Scott v. Harris*, 550 U.S. 372, 380 (2007). Plaintiff has properly raised many genuine issues of material facts that must be viewed in Plaintiff's favor and which are aligned with the video evidence.

While Pfister did briefly obtain the folding knife with a 3 ¼ inch blade, she did so by prying it away from Serbus who caused her to be in two car crashes, drove her on a police chase, held her hostage using the knife, and used her as body armor to shield himself from 11 armed officers, some of whom shot at him while he was holding her as body armor. Pfister did not assault anyone. Nor did she threaten to do so, as no officer heard her speak during the encounter. The mere possession of a knife is insufficient to justify the use of deadly force. *Diaz v. Salazar*, 924 F. Supp. 1088, 1094 (D.N.M. 1996) (In denying summary judgment, the court noted: "Although a knife is a deadly weapon, its mere status as such does not create the justification for the use of deadly force.") Other courts have similarly held. In *Tenorio*, 802 F.3d 1160, the Tenth Circuit denied qualified immunity for an officer who shot an individual who loosely held a kitchen knife, had taken three steps forward, but was not within striking distance and made no aggressive movement toward any officer. In *Samples*, 846 F.2d 1328, the Eleventh Circuit denied summary judgment for an officer who shot an individual who held a knife with a three inch blade.

Defendant Juell's reliance on *Estate of Morgan v. Cook*, 686 F.3d 494 (8th Cir. 2012) is misplaced because the facts are distinguishable. Officer Cook was called to Morgan's

43

residence on a report of a domestic situation. *Id.* at 495. Cook believed Morgan was

intoxicated because he was observed to have stumbled and fallen while walking. *Id.* Cook

also had had previous interactions with Morgan. *Id.* After arriving and nearing the porch

where Morgan had fallen, Cook was informed Morgan had a knife and believed he saw

Morgan trying to conceal it in his right hand. *Id.* After repeated commands to drop the

knife, Morgan failed to do so and "[i]nstead Morgan **stood up and moved toward** Cook."

*Id.* at 497 (emphasis added). Cook shot Morgan once after he moved towards him. *Id.*

*Morgan* did not involve a hostage, let alone a situation where only 1 of 11 officers shot the

hostage who was **not** standing, threatening, advancing or attacking officers.

At the time Juell shot Pfister, she had **not** gotten to a standing position. She appears

significantly off balance in the video. Pfister had **not** closed the gap between her and any

officer. She did **not** move forward or close the proximity between her and the officers. She

had **not** come within striking distance to any officer. In fact, Juell was backing away from

Pfister at the time he shot her. Pfister most certainly did **not** "attack" anyone with the small,

folding knife. Further, Pfister was only given a small window of time when compared to the

amount of time Serbus was given to follow officers' commands. *See Tenorio*, 802 F.2d at

1166 (10th Cir. 2010) (The Tenth Circuit agreed with district court that the jury could find

Tenorio "did not 'refuse' to drop the knife because he was not given sufficient time to

comply" with Pitzer's command.) Additionally, Pfister was not holding anyone hostage.

Multiple opinions issued before Juell's actions in 2014 clearly establish that officers

may not use deadly force when faced with a person armed with a knife in certain

circumstances or as a matter of course. In particular, numerous cases hold that officers are

not entitled to summary judgment when the individual did not advance upon the officer. *See Zulock*, 441 Fed. Appx. at 302 (6th Cir. 2010) (no qualified immunity when individual shot by officer took one-half or one step away from officer when shot); *Bui*, 61 F. Supp. 3d at 894 (N.D. Cal. 2014) (no qualified immunity for officer when individual was in a defensive, cringing posture and turned away from the officer when he was shot); *Herrera*, 298 F. Supp. 2d at 1050 (D. Nev. 2004) (no qualified immunity for officer when individual was merely standing with a knife when he was shot and killed). Summary judgment based on qualified immunity was also denied in similar situations where the knife was small. *See, Bui*, 61 F. Supp. 3d at 894 (N.D. Cal. 2014) (no qualified immunity for shooting of individual with X-Acto knife); *Glenn,* 673 F.3d 864 (9th Cir. 2011) (no qualified immunity for shooting of individual with pocket knife). Further, "[i]n order to justify use of deadly force, it is not enough that a person armed with a knife takes 'dangerous, threatening or aggressive actions;' their actions must 'pose[ ] a threat of serious physical harm.'" *Reed v. City of Modesto*, 122 F. Supp. 3d 967, 980 (N.D. Cal. 2015) (quoting *Ludwig v. Anderson*, 54 F. 3d 465, 473 (8th Cir. 1995)).

Dawn Marie Pfister did **<u>not</u>** pose an immediate threat of serious physical harm. At the time of the incident, the unsteady Pfister was 5 feet 10 inches tall and weighed only 124.5 pounds.[247] Plainly, Pfister was no match for Juell or any other officer on the scene. She was surrounded by a tactical array of eleven trained officers armed with rifles and pistols aimed in her direction. In addition to these eleven officers, there were other officers blocking the next exit on Highway 212 and a sound wall to her side. Pfister had nowhere to go and made

---

[247] Ex. 2, Pfister Autopsy at 5.

no movements in an attempt to flee or resist. Additionally, the officers had time to consider options because Pfister only had a small knife. Taking these facts as true, Pfister did not pose an immediate threat of serious bodily harm or death to Juell or any other party present at the scene.

### III. Pfister's Constitutional Rights Violated by Juell Were Clearly Established at the Time of the Incident and No Reasonable Officer Could Have Believed Otherwise

Since 1985, when the United States Supreme Court decided *Tennessee v. Garner*, "it has been clearly established 'that the use of deadly force against a fleeing suspect who does not pose a significant threat of death or serious physical injury to the officer or others is not permitted.'" *Wallace*, 2016 WL 7174116 at *4 (8th Cir. Dec. 9, 2016) (quoting *Moore v. Indehar*, 514 F.3d 756, 763 (8th Cir. 2008)). Let alone against one that was not fleeing. Of key importance here is *Craighead v. Lee*, 399 F.3d 954 (8th Cir. 2005). In *Craighead* the Eighth Circuit cited a collection of cases that put officers on notice that they cannot use deadly force under circumstances where "they should know that the suspect does not present and immediate threat of serious physical harm of injury." *Id.* at 962. The court used these cases as justification to affirm the district court's denial of summary judgment to an officer who shot Craighead after Craighead had seized and held the gun of an individual who had already killed two people. *Id.* at 962-63.

Additionally, the "legal norms" governing the reasonableness of an officer's use of deadly force on an individual carrying a knife were clearly established at the time of this incident: "[w]here an officer had reason to believe that a suspect was only holding a knife, not a gun, and the suspect was not charging the officer and had made no slicing or stabbing

46

motions toward him…it was unreasonable for the officer to use deadly force against the suspect." *Walker*, 451 F.3d at 1159 (citing *Zuchel v. City of Denver*, 997 F.2d 730, 735-36 (10th Cir. 1993)); *see also Reed*, 122 F. Supp. 3d at 979-981 (N.D. Cal 2015) (distinguishing the line of cases where officers may not use deadly force on a subject with a knife from those where the individual with the knife advanced and the force was reasonable.)  The key factors that provide the officers who shot Serbus with qualified immunity are absent in the analysis of whether qualified immunity should be afforded Juell in killing Pfister.  Lund's single first shot was because he reasonably believed that Serbus held a gun.  When Lund learned it was a knife, he held his fire until the proximity of the hostage, Pfister, along with the stabbing motions directed at her, made it objectively reasonable to fire on Serbus.  In total, four officers made this shoot decision on Serbus and others agreed they could have done so properly.  That analysis does not apply to Juell's decision to shoot Pfister, a much lesser threat by any measure than Serbus was to her as he held and stabbed at her.  Juell tries to bolster any threat Pfister posed by purporting to read her mind and expressionless face (according to Pearce) and by a claim that she attacked him with a big knife, which is simply not the case.  He wants us to ignore the conduct – in not shooting – of the ten other officers at the scene.  He wants a subjective, not objective, analysis that would give qualified immunity to every officer who claimed he thought there was a deadly risk after the fact, despite the mountain of evidence to the contrary.

## CONCLUSION

The law was clearly established on February 7, 2014 that officers cannot use deadly force on an individual with a small knife who poses no significant threat of death or serious

physical injury to the officer or others.  A jury could reasonably conclude from the evidence in this case that Juell's use of deadly force on Pfister was excessive and unreasonable.  There exist significant, genuine issues of material face that preclude summary judgment on the basis of qualified immunity.  Defendant Juell's motion for summary judgment should be denied.

**GASKINS BENNETT BIRRELL SCHUPP, LLP**

Date:  February 8, 2017          *s/Robert Bennett*
Robert Bennett, #6713
Andrew J. Noel, #0322118
Kathryn H. Bennett, #0392087
333 South Seventh Street, #3000
Minneapolis, MN  55402
Telephone: 612-333-9500
rbennett@gaskinsbennett.com
anoel@gaskinsbennett.com
kbennett@gaskinsbennett.com
Attorneys for Plaintiff