UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Philip Sieff, as trustee for the
next-of-kin of Dawn Marie Pfister,   Case No. 15-cv-419 (PAM/DTS)

           Plaintiff,

v.   **MEMORANDUM AND ORDER**

Brady Juell,

           Defendant.

_____

This matter is before the Court on Defendant Brady Juell's Motion for Summary Judgment. For the following reasons, the Motion is denied.

**BACKGROUND**

At approximately 7:30 a.m. on February 7, 2014, Chaska Police Sergeant Brady Juell received a report from dispatch that a speeding vehicle had forced several cars off the road on Highway 212 near Norwood Young America, and was heading eastbound towards Chaska. (Juell Statement (Docket No. 59-7) at 6.) Sergeant Juell responded, drove to Highway 212, and intercepted the erratically driven vehicle. (Id.) The vehicle passed Sergeant Juell driving approximately 45 miles per hour with its hood flipped up, blocking the windshield. (Id. at 7.) Sergeant Juell observed a male in the driver's seat, later identified as Matthew Serbus, and a female in the passenger's seat, later identified as Dawn Pfister. (Id.) He then turned on his lights and sirens, and attempted to initiate a traffic stop. (Id.)

Serbus failed to pull over and led Sergeant Juell on a chase through Chaska, Chanhassen, and Eden Prairie. During the chase, Sergeant Juell observed Pfister reach out the window and attempt to put the hood down with an ice scraper. (Id. at 8.) Eventually, an additional ten law-enforcement officers joined Sergeant Juell. Minnesota State Trooper Mark Lund and Carver County Sheriff's Corporal Nathan Mueller were two of those responding officers. Both Lund and Mueller's dash cameras captured the incident.

Lund initially positioned himself ahead of the chase intending to deploy stop sticks to deflate the vehicle's tires, but the vehicle passed him before he had the opportunity. (Lund Statement (Docket No. 52-1) Ex. 12 at 4.) Lund pursued, took the lead in the chase, and planned to perform a Precision Immobilization Technique ("PIT") maneuver. (Id.) Before he could do so, the vehicle crashed into a barrier wall and came to a stop on the highway. (Lund Video (Docket No. 52-13) at 8:05.)

Lund stopped, exited his squad car with his weapon drawn, and ordered Serbus and Pfister out of the car. (Id. at 8:15.) Serbus emerged from the driver's side door and Lund yelled for Serbus to show him his hands. (Id. at 8:21.) Serbus ignored the order and went back into the vehicle. (Id. at 8:30.) Lund continued to shout orders at Serbus and relayed to his fellow officers that Serbus had something in his right hand, although he could not "tell if it's a gun" but instructed them to "bring rifles." (Id. at 8:40.)

Serbus and Pfister eventually emerged out of the driver's side door. (Id. at 10:00.) The two stood near each other outside the vehicle when Serbus reached his hand towards his back pocket and Lund shouted to his fellow officers "He's going for a gun. He's got

her as body armor." (Id. at 10:18.) Chaska police officer Trenton Wurtz radioed that it appeared to be a hostage situation. (Id. at 10:31.) Serbus and Pfister then staggered a few steps away from the vehicle. Both appeared to be wobbling and struggling to stand up. (Id.) Several officers saw Serbus and Pfister kiss, embrace, and whisper to each other. (See, e.g., Meyer Dep. (Docket No. 52-4) at 52.) Others thought Serbus and Pfister were like "Bonnie and Clyde." (Bramwell Stat. (Docket No. 52-5) Ex. 9 at 8.)

As Lund continued to shout for Pfister to lay down, Serbus raised his hand, and Lund shot at Serbus and missed. (Id. at 11:00.) Serbus and Pfister continued to wobble with each other for several seconds before Pfister attempted to go to the ground, but she either stood back up, or Serbus pulled her back up. (Id. at 11:27.) Seconds later, Serbus raised his hand another time and Lund noticed and announced that Serbus had a knife. (Id. at 11:35.) Serbus and Pfister then staggered further into the road at which point Lund stated, "I gotta drop him, guys." (Id. at 11:50.) That is when the first round of shots rang out. (Id.)

Multiple officers fired eleven shots at Serbus over a 15-second period, hitting Serbus several times. (Id. at 11:56; Serbus Autopsy (Docket No. 59-28).) Although none of the bullets hit Pfister, Pfister remained next to Serbus, wobbling back and forth on the road until the two finally fell to the ground, Pfister on top of Serbus. (Id.; Pfister Autopsy (Docket No. 59-2).) Sergeant Juell and Carver County Sheriff's Sergeant Lance Pearce were approaching Serbus and Pfister when Pfister reached over Serbus, grabbed the knife, and attempted to stand up. (Lund Video at 12:10.) As she got up, Sergeant Juell fired four shots at Pfister, killing her. (Id. at 12:20.) Serbus then attempted to stand back

up, at which point multiple officers fired multiple shots at Serbus, killing him. (Id. at 12:24.)

On February 2, 2015, Plaintiff Phillip Sieff, acting as trustee to the next-of-kin of Dawn Pfister, sued Sergeant Juell and the City of Chaska (the "City") under 42 U.S.C. § 1983 alleging that Sergeant Juell used excessive force in violation of the Fourth Amendment when he shot and killed Pfister, and that the City failed to properly train its police officers to avoid the improper use of deadly force. On December 30, 2016, Sergeant Juell and the City filed this Motion for Summary Judgment arguing that qualified immunity shields Sergeant Juell from suit, and that the record evidence does not establish that the City failed to adequately train its officers. On January 9, 2017, Sieff stipulated to the dismissal of his claim against the City. The Court dismissed the failure-to-train claim and terminated the City two days later. Only the claim against Sergeant Juell remains.

**DISCUSSION**

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The Court must view the evidence and inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. Enter. Bank v. Magna Bank, 92 F.3d 743, 747 (8th Cir. 1996). The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). A party opposing a properly supported motion for summary judgment may not rest on mere allegations or denials, but

must set forth specific facts in the record showing that there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). A police officer is "entitled to summary judgment based on qualified immunity unless (1) the evidence, viewed in the light most favorable to the nonmoving party, establishes a violation of a federal constitutional or statutory right, and (2) the right was clearly established at the time of the violation." Capps v. Olson, 780 F.3d 879, 884 (8th Cir. 2015).

**A.    Constitutional Violation**

The Fourth Amendment to the United States Constitution protects "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "Apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." Craighead v. Lee, 399 F.3d 954, 961 (8th Cir. 2005) (citing Tennessee v. Garner, 471 U.S. 1, 7 (1985)). Whether deadly force is reasonable "turns on whether the officer's actions were objectively reasonable in light of the facts and circumstances confronting him, without regard to his subjective intent or motivation." Loch v. City of Litchfield, 689 F.3d 961, 965 (8th Cir. 2012) (citing Graham v. Connor, 490 U.S. 386, 395 (1989)). The Court considers the "totality of the circumstances, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer or others, and whether the suspect is actively fleeing or resisting arrest." Capps, 780 F.3d at 884 (citation omitted). If a suspect "poses a threat of serious bodily harm to the officer or others," an officer's use of deadly force is reasonable. Id. (citations and quotations omitted).

Sergeant Juell argues that his use of deadly force on Pfister was reasonable under the circumstances. He asserts that Pfister assisted Serbus in fleeing the officers, failed to comply with officer commands, hugged and kissed Serbus during the incident, and posed an immediate threat to the safety of him and other officers when she attacked them with Serbus's knife. But the Court must consider the totality of the circumstances in the light most favorable to Sieff, and too many factual disputes exist that preclude summary judgment.

The most obvious and overarching factual issue here is whether Pfister was Serbus's hostage or partner-in-crime. Sieff argues that Pfister was merely concerned for her safety when she attempted to put the hood down during the chase; that Serbus used Pfister as body armor; that the on-the-scene officers understood the incident to be a hostage situation; and that Pfister was merely attempting to disarm Serbus and flee when she wrestled the knife away and attempted to stand up. According to Sieff, Sergeant Juell's "apocalyptic and grandiose" belief that Pfister posed a threat of serious physical harm to him and his fellow officers was "imaginary," and his inability to "mind read" makes his use of deadly force objectively unreasonable under the circumstances. (Pl.'s Opp'n Mem. (Docket No. 57) at 1, 32.) Although Sieff's hyperbole is both distracting and ineffective, the Court must view the facts in the light most favorable to Sieff. And his version of the facts—that Pfister was a hostage who disarmed and attempted to flee Serbus—could establish a violation of Pfister's constitutional rights.

**B.    Clearly Established Constitutional Right**

Assuming Sergeant Juell violated Pfister's constitutional rights, qualified immunity may still protect Sergeant Juell if the right defined in this specific context was not clearly established. The "salient question" is whether the law at the time of the incident provided "fair warning" to Sergeant Juell that his conduct was unconstitutional. Tolan v. Cotton, 134 S. Ct. 1861, 1866 (2014) (per curiam) (citations and quotations omitted). "This inquiry . . . must be undertaken in light of the specific context of the case, not as a broad general proposition." Saucier v. Katz, 533 U.S. 194, 201 (2001).

Sergeant Juell had fair warning at the time of the shooting that the use of deadly force against a fleeing suspect who does not pose a significant and immediate threat of serious injury or death to an officer or others is not permitted. See Capps, 780 F.3d at 886 (collecting cases). The use of deadly force is even more forbidden when it is intentionally used against a hostage attempting to disarm and flee her captor. See Nance v. Sammis, 586 F.3d 604, 611 (8th Cir. 2009) ("For a constitutional right to be clearly established, there does not have to be a previous case with exactly the same factual issues.") Therefore, in light of the specific context of this case, the constitutional right Sergeant Juell allegedly violated was clearly established at the time of the shooting.

**CONCLUSION**

Viewing the facts in the light most favorable to Sieff, qualified immunity does not shield Sergeant Juell from suit. Accordingly, **IT IS HEREBY ORDERED that** Sergeant Juell's Motion for Summary Judgment (Docket No. 49) is **DENIED**.

Dated: March 8, 2017            *s/ Paul A. Magnuson*
                                             Paul A. Magnuson
                                             United States District Court Judge